844 F.2d 1485
 56 USLW 2708, Fed. Sec. L. Rep. P 93,746,
11 Fed.R.Serv.3d 268
 James L. SHORES, Jr., Executor of the Estate of Clarence E.
Bishop, Jr., in behalf of himself and all other persons who
purchased First Mortgage 8% Revenue Bonds issued by the
Industrial Board of the Town of Frisco City, Alabama,
Plaintiff-Appellant,
v.
Jerald H. SKLAR, et al., Defendants-Appellees.
 No. 86-7898.
 United States Court of Appeals,
Eleventh Circuit.
 May 10, 1988.
 
 W. Eugene Rutledge, Rutledge & Kelly, Birmingham, Ala., for plaintiff-appellant.
 Crawford S. McGivaren, Jr., Cabaniss, Johnston, Gardner, Dumas & O'Neal, Larry B. Childs, Birmingham, Ala., for Jerald H. Sklay, R., et al.
 Lee H. Zell, Berkowitz, Lefkovits, Isom & Kushner, Susan Salonimer, Birmingham, Ala., for Asa G. Candler.
 Frank M. Young, III, Haskell, Slaughter & Young, James L. Richey, Birmingham, Ala., for Cecil J. Lamberson & Jackson Municipals, Inc.
 Hobart A. McWhorter, Jr., Bradley, Arant, Rose & White, Richard H. Walston, Henry E. Simpson, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for Capell, Howard, Knabe & Cobbs.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before FAY and KRAVITCH, Circuit Judges, and ATKINS*, Senior District Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 On this appeal we revisit the case that established the "fraud on the market" theory of securities law in our predecessor circuit. See Shores v. Sklar, 647 F.2d 462 (5th Cir.1981) (en banc), cert. denied, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983) (Shores I ).[1]
 
 I.
 
 2
 The events giving rise to this litigation occurred almost sixteen years ago. In 1972, J.C. Harrelson, the president of Alabama Supply & Equipment Co. (ASECo) decided to seek financing for the construction of an industrial plant where ASECo would build mobile homes. After discussions with Clarence Hamilton, the president of an underwriting firm, Harrelson approached the town of Frisco City, Alabama for financing.
 
 
 3
 Under Alabama law, a municipality may establish industrial development boards with authority to issue tax-exempt bonds.[2] The statutory scheme provides for the board to build an industrial facility with the bond issue proceeds and then to lease the facility to a commercial enterprise. The rent from the commercial enterprise is calculated to amortize the interest and principal of the bonds. The bonds are not general obligation bonds of the municipality, and the municipality is not liable for the payment of the industrial development board's obligations. Bondholders must look to the rental payments for satisfaction of their obligations. The bonds must be secured by a pledge of the commercial enterprise's revenues and may be secured further by a mortgage covering the plant.
 
 
 4
 Frisco City agreed to the establishment of an industrial development board for the financing of ASECo's mobile home facility. The development board signed a lease with ASECo on November 1, 1972, requiring ASECo to pay as rent the amount necessary to amortize the interest and principal of the bonds that the board would issue. Hamilton retained appellee Jerald Sklar, a Tennessee attorney, as bond counsel. Sklar drafted the lease, bond indenture, mortgage, and closing papers. Sklar also drafted the offering circular for the bond issue, which allegedly contained numerous material misrepresentations and omitted material facts concerning the financial solvency and responsibility of Hamilton, Harrelson, and ASECo. The Phenix National Bank acted as trustee of the bond proceeds.
 
 
 5
 The bonds went on sale in three increments during 1972 and 1973. In January 1973, Tom Monks, the president of a Birmingham securities firm, advised his client Clarence Bishop that the tax-free industrial development bonds were a good investment opportunity. Monks told Bishop that others in the community had purchased the bonds. Bishop purchased three of the bonds in January 1973 for a total of $3,052.67, and one bond in February 1973 for $1,043.37. Bishop never read the offering circular and indeed never knew that one existed.
 
 
 6
 ASECo made two rent payments to the bond trustee; the trustee in turn made the first two interest payments to the bondholders. In April 1974, ASECo defaulted, and Phenix National Bank failed to make the third interest payment. The bank compiled a list of the names and addresses of persons holding the bonds at that time. After receiving the consent of 70% of all known bondholders, the bank foreclosed and sold the ASECo facilities. Eventually the bank paid 37% of the face amount of the bonds to the 131 known bondholders.
 
 
 7
 On May 16, 1975, Bishop filed suit against Hamilton, Sklar, Sklar's law firm, Phenix National Bank, and numerous others, alleging that the defendants violated, inter alia, section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and the Securities and Exchange Commission's Rule 10b-5 promulgated thereunder, 17 C.F.R. Sec. 240.10b-5. During the course of discovery, it became apparent that Bishop never saw the offering circular for the bond issue but bought the bonds solely on his broker's oral representations that the bonds were a good investment. The defendants moved to dismiss Bishop's action, arguing that Bishop's admitted nonreliance on any of the statements in the offering circular precluded recovery under Rule 10b-5. See Dupuy v. Dupuy, 551 F.2d 1005, 1014 (5th Cir.) (plaintiff must prove reliance on defendant's misrepresentation to recover under 10b-5), cert. denied, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). The district court agreed and, treating the defendants' motion to dismiss as a motion for summary judgment, granted summary judgment against Bishop.
 
 
 8
 The former Fifth Circuit, sitting en banc, reversed. Shores I, 647 F.2d 462. In Shores I, the court adopted a version of the "fraud on the market" theory of recovery under Rule 10b-5, whereby the requisite element of reliance may be satisfied by proof that the plaintiff relied on the integrity of the market without a showing of direct reliance on specific misrepresentations by the defendants.[3] Shores I involved an alleged fraud on the "undeveloped market," in that Bishop asserted that the newly issued Frisco City bonds were not entitled to be placed on the market at all and would not have been marketed but for the defendant's fraud. Under the theory of fraud on the undeveloped market approved in Shores I, the element of reliance is presumed once the plaintiff proves that the deception was material, i.e., that absent the deception the bonds would not have been marketed. See Ross v. Bank South, N.A., 837 F.2d 980, 995 (11th Cir.1988).
 
 
 9
 The appellants petitioned the Supreme Court for a writ of certiorari, which was denied. Sklar v. Shores, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983). After the case returned to the district court, the named plaintiff (by then James Shores, the executor of Bishop's estate), moved for certification of a class action. Pending a ruling on the class certification motion, Norman Habshey moved for permissive intervention as a named plaintiff.
 
 
 10
 Following evidentiary hearings on both motions in August and September 1985, the district court denied both Shores' motion for class certification and Habshey's motion for intervention in a memorandum opinion issued July 30, 1986.[4] The court found that Shores had failed to prove (a) the existence of a class, (b) that the class was so numerous that joinder of all members was impracticable, (c) that Shores' claims or defenses were typical of the claims and defenses of the class, or (d) that Shores would adequately protect the interests of the class.[5] As to Habshey, the court concluded that the motion to intervene was untimely. In addition, the court found that Habshey would not be an appropriate class representative because Habshey lacked even the most basic understanding of the claims and parties involved in the suit, Habshey's testimony lacked credibility, and Habshey's claims or defenses were not typical of the claims or defenses of the class.
 
 
 11
 Neither Habshey nor Shores immediately appealed the district court's order. Shores' individual action was assigned for trial in January 1987. On November 25, 1986, most of the defendants filed an offer of judgment to Shores in the amount of $20,600 pursuant to Fed.R.Civ.P. 68. Shores accepted this offer, and final judgment for $20,600, plus costs, was entered in favor of Shores on November 29, 1986.
 
 
 12
 On December 22, 1986, Shores filed a notice of appeal from the order denying class certification. In the same document, Habshey filed a notice of appeal from the order denying his motion to intervene. In this court, appellees moved to dismiss both appeals for lack of jurisdiction, arguing that Habshey's appeal was untimely and that Shores' acceptance of the offer of judgment eliminated the case or controversy necessary for article III jurisdiction. Appellees also oppose both appeals on the merits. We turn first to the jurisdictional issues raised by appellees.
 
 II.
 A.
 
 13
 A motions panel denied appellees' motion to dismiss Shores' appeal, citing Love v. Turlington, 733 F.2d 1562 (11th Cir.1984). Under the rules of this court, the decision of the motions panel is not binding on the panel to which the case is assigned on the merits, 11th Cir.R. 27-1(f), and because of the importance of the issue we consider it anew.
 
 
 14
 Appellees correctly state the general rule that a party may not appeal a judgment to which it has consented, absent an allegation of fraud, lack of actual consent, or failure of subject matter jurisdiction. See Swift & Co. v. United States, 276 U.S. 311, 314, 48 S.Ct. 311, 72 L.Ed. 587 (1928); Dorse v. Armstrong World Industries, Inc., 798 F.2d 1372, 1375 (11th Cir.1986). Appellees further note that a party may appeal from a judgment to which it has consented if that party expressly reserved its right to appeal. Dorse, 798 F.2d at 1376. In this case, Shores did not expressly reserve his right to appeal from the final judgment entered by the district court. Therefore, appellees argue, Shores may not appeal from that judgment.
 
 
 15
 Swift & Co. and Dorse do not tell the whole story, however. In a line of cases beginning with Deposit Guaranty National Bank v. Roper, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980), the Supreme Court and this court have held that a named plaintiff may, after final judgment, appeal a district court order denying class certification even in some circumstances where the named plaintiff might be unable to appeal the final judgment itself. In Deposit Guaranty, the Supreme Court held that named plaintiffs suing a bank on behalf of a class of credit card holders could appeal an order denying class certification even though the district court had entered, over the plaintiffs' objection, final judgment in each plaintiff's favor in the maximum amount that each plaintiff could have recovered. Noting that the named plaintiffs retained an interest in shifting the costs of litigation to the entire class, the Court reasoned that the plaintiffs retained a sufficient personal stake in class certification to support article III jurisdiction on the appeal from the order denying certification. Id. at 333, 338, 100 S.Ct. at 1171, 1173.
 
 
 16
 In United States Parole Commission v. Geraghty, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), decided the same day as Deposit Guaranty, the Supreme Court held that a named plaintiff could appeal an order denying class certification, even though the individual claim of the named plaintiff, a prisoner, had expired after the entry of final judgment due to his release from prison. Emphasizing the "flexible character of the Art. III mootness doctrine," id. at 400, 100 S.Ct. at 1211, the Court stated that "[a] plaintiff who brings a class action presents two separate issues for judicial resolution. One is the claim on the merits; the other is the claim that he is entitled to represent a class." Id. at 402, 100 S.Ct. at 1211. Although the right to represent a class in some senses did not resemble the "personal stake" necessary for article III jurisdiction, nonetheless the controversy over class certification satisfied the essential values of article III jurisdiction--vigorous litigation and a concrete factual setting. The Court thus held that a proposed class representative retains a sufficient personal stake in the certification decision to appeal the denial of certification even after his own claim on the merits has expired. Id. at 404, 100 S.Ct. at 1212.
 
 
 17
 In Geraghty, the Supreme Court left open whether a plaintiff who settles its individual claim after denial of class certification may appeal the adverse ruling. Id. at 404 n. 10, 100 S.Ct. at 1212 n. 10. This court encountered precisely that situation in Love v. Turlington, 733 F.2d 1562 (11th Cir.1984). The district court had denied the plaintiff's motion for class certification, and the parties had subsequently settled the case. Finding "no meaningful distinction between the settlement of the claim here at issue and the expiration of the claim in Geraghty," this court held that the class certification issue continued to be a dispute capable of judicial resolution on appeal. Id. at 1565.
 
 
 18
 Appellees seek to distinguish Love by arguing that in that case the plaintiff expressly reserved her right to appeal; therefore Love was merely an application of the Dorse doctrine holding jurisdiction to exist when a party expressly reserves the right to appeal from an order to which it has consented. We cannot agree that Love will bear this interpretation. It is true that in Love the defendants expressly agreed not to contest the appealability of the certification order. The Love panel considered this agreement irrelevant to the jurisdictional inquiry, however, due to the established principle that federal subject matter jurisdiction cannot be created by agreement of the parties. Id. at 1564. Love relied explicitly and exclusively on the analogy to Geraghty to conclude that article III jurisdiction existed. Because Love squarely controls this case, we conclude that we have jurisdiction over Shores' appeal.
 
 B.
 
 19
 We agree with appellees that we lack jurisdiction over Habshey's appeal, however. The district court denied Habshey's motion to intervene on July 30, 1986. Although denials of motions to intervene are ordinarily immediately appealable, Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad Co., 331 U.S. 519, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947), Habshey waited 145 days after the denial of his motion to file a notice of appeal. Under 28 U.S.C. Sec. 2107 and Fed.R.App.P. 4(a), a notice of appeal in a civil case must be filed within 30 days of the entry of the order from which the appeal is taken. This 30-day time limit is "mandatory and jurisdictional." Browder v. Director, Department of Corrections, 434 U.S. 257, 264, 98 S.Ct. 556, 561, 54 L.Ed.2d 521 (1978).
 
 
 20
 Habshey seeks to distinguish Railroad Trainmen by relying on Stringfellow v. Concerned Neighbors in Action, --- U.S. ----, 107 S.Ct. 1177, 94 L.Ed.2d 389 (1987), in which the Supreme Court held that a party may not immediately appeal a district court's denial of its motion for intervention of right when the court simultaneously grants the party's motion for permissive intervention. Under the rationale of Stringfellow, such a movant becomes a party to an action when the trial court grants its motion for permissive intervention and can obtain appellate review of the denial of its motion for intervention of right after final judgment. The would-be intervenors in Railroad Trainmen, by contrast, were not parties and could not appeal from the final judgment; thus they were entitled to appeal immediately the denial of their motion to intervene. Habshey likens himself to the intervenor in Stringfellow because he is a member of the putative class. He argues that because he was in some sense a party to the action, he could not have obtained immediate appellate review of the denial of his motion.
 
 
 21
 To accept Habshey's argument, we would have to conclude that Habshey, an unnamed member of a putative class, is a party who could obtain appellate review of a final judgment on the merits binding only the individual, named plaintiff. We need not delve into the jurisprudential complexities of precisely who is a "party" to a class action to conclude that Habshey's argument is without merit. In Guthrie v. Evans, 815 F.2d 626 (11th Cir.1987), this court concluded that an unnamed member of a certified class has no standing to appeal a final judgment when the named plaintiffs have declined to do so. As we explained in Guthrie, an unnamed member of a class action always has the option of moving to intervene in the course of the class action if he disagrees with the course of proceedings taken by the representative party. If the district court denies the motion to intervene, the unnamed class member may appeal that denial immediately. Id. at 628. Habshey has even a less meritorious position than did the appellant in Guthrie. If unnamed members of a certified class may not appeal from a final judgment on the merits but must move to intervene as named plaintiffs and appeal immediately if that motion is denied, it is even less likely that unnamed members of a putative class may wait until final judgment to appeal the denial of a motion to intervene. We therefore conclude that Habshey's appeal is untimely.[6]
 
 III.
 A.
 
 22
 Before addressing in detail the parties' contentions on the class certification issue, we summarize the reasons given by the district court for denying Shores' motion for certification.
 
 
 23
 First, the district court found that Shores had failed to identify the existence of a class.[7] In interpreting our mandate in Shores I that the district court "reconsider the maintainability of this action as a class action as to members of a properly defined class of Bond purchasers who did not ... rely [on the offering circular]," 647 F.2d at 472, the district court believed that a certified class in this case could include only those bond purchasers who had not relied on the offering circular and must exclude bond purchasers who did so rely. With this understanding of the permissible class definition, the district court feared that extensive individual adjudication and fact-finding would be necessary merely to determine which bond purchasers would be in the class.
 
 
 24
 Second, the district court found that Shores had failed to establish that the class was so numerous as to render joinder of all members impracticable. See Fed.R.Civ.P. 23(a)(1). In so concluding, the district court relied further on its understanding of our mandate in Shores I. Interpreting the class as limited solely to purchasers who did not rely on the circular, the district court found no evidence to suggest that such a class would be numerous. The district court also rejected the evidence proffered by Shores showing that the class of all bondholders was numerous, noting that under the doctrine of Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), only purchasers or sellers of securities may state a claim under Rule 10b-5; mere holders of securities, as such, have no cause of action. In the district court's view, the numerosity of the class of bondholders had little, if any, relevance to the numerosity of the class of bond purchasers.
 
 
 25
 Third, the district court found that Shores had failed to establish that his claims or defenses were typical of the claims or defenses of the class. See Fed.R.Civ.P. 23(a)(3). The court noted that Shores himself was not even a member of the class, as he personally had not purchased any bonds. Even in his capacity as executor of Bishop's estate, however, Shores presented atypical claims. Because both Bishop and Tom Monks (who sold Bishop the bonds) had died, significant difficulties of proof attended Shores' claim. No one, other than Bishop and Monks, could testify as to the circumstances of Bishop's purchase of the bonds. As a result, no one living could establish the truth of Bishop's allegations, that he had relied on the integrity of the undeveloped market in making his decision to purchase the bonds, and that he was willing to accept any marketable risk.
 
 
 26
 Fourth, the district court found that Shores was an inadequate class representative. See Fed.R.Civ.P. 23(a)(4). In support of this conclusion, the district court repeated its doubts that Shores would be able to establish the truth of Bishop's allegations. The court further determined that Shores' role as executor of Bishop's estate placed him in potential conflict with other members of the class, because Bishop's will placed Shores under an obligation to wind up Bishop's affairs and distribute his assets within six months of Bishop's death. The district court also doubted whether Shores, as executor, would be willing to risk the estate's resources to pursue a small monetary claim.
 
 B.
 
 27
 It is apparent that the district court's refusal to certify the class resulted largely from a misunderstanding of our opinion in Shores I. Unlike the district court, we have the benefit of two recent opinions of this court that have done much to clarify the meaning of Shores I and the scope of the "fraud on the market" theory generally. See Ross v. Bank South, N.A., 837 F.2d 980 (11th Cir.1988); Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718 (11th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988).(1)
 
 
 28
 The district court was mistaken in its belief that the mandate of Shores I excluded from the permissible class any purchaser who had relied on the offering circular. As we explained in Kirkpatrick, "the instruction that the district court determine the maintainability of a separate class for purchasers who did not rely was based simply upon the recognition that, as a practical matter, those purchasers should have a greater factual burden to establish liability than would those who relied on the offering circular. The instruction did not imply, however, that those who had relied on the offering circular could not also recover under the fraud-on-the-market theory." 827 F.2d at 724 n. 4.
 
 
 29
 The district court thus should not have refused to certify the class because it could not identify the class of persons relying on the integrity of the market but not relying on the offering circular without extensive fact-finding. The essential characteristic of the "fraud on the undeveloped market" theory is that it renders distinctions based on individual patterns of reliance unnecessary. Once the plaintiff establishes the materiality of the fraud, reliance on the integrity of the market "is presumed with respect to all purchasers of securities. It is common sense that purchasers do not ordinarily seek to purchase a loss in the form of a fraudulently marketed bond." Ross, 837 F.2d at 995.
 
 
 30
 (2)
 
 
 31
 The district court's conclusion that Shores had not established that the purported class was sufficiently numerous was also influenced by its mistaken belief that Shores could represent only the class of purchasers not relying on the circular. As explained above, the distinction between purchasers relying on the circular and purchasers not so relying was immaterial. Shores was required to demonstrate only that the class of purchasers was numerous. See Ross, 837 F.2d at 995 (reliance presumed with respect to all purchasers once materiality of fraud on the undeveloped market is established).
 
 
 32
 The district court further concluded that Shores had not even carried the burden of showing that the class of bond purchasers was numerous, as the evidence adduced demonstrated only that Phenix National Bank had refused payment of interest to over one hundred bondholders. Testimony at the evidentiary hearing established that the bond coupons presented to Phenix National Bank were bearer coupons; the list of bondholders compiled by the bank did not demonstrate who the original purchasers were. Because only a purchaser or a seller of a security may state a claim under Rule 10b-5, Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), many of the bondholders who were refused payment by the bank might not have had a claim under 10b-5.
 
 
 33
 We need not consider whether Shores is correct that certain successors in interest to purchasers come within the Blue Chip Stamps rule to conclude that the district court erred. The district court was unduly concerned that every single member of the putative class be able to state a claim under the Blue Chip Stamps rule. At the class certification hearing, Shores was not required to demonstrate that every member of the putative class was likely to prevail on the merits; nor was he required to show the exact number of persons in the class. Shores had to show merely that the class was so numerous that joinder of all members was impracticable.
 
 
 34
 We understand the district court's concern that bondholders are not equivalent to bond purchasers for the purpose of stating a cause of action under Rule 10b-5, but this concern did not justify refusing to certify the class for two reasons. First, the problem of individual members' inability to demonstrate that they were purchasers can be resolved through separate proceedings, if necessary, limited to that issue. Cf. Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir.) (district court abused discretion by refusing to certify class merely because some members might not be able to show reliance), cert. denied, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); Baxter v. Savannah Sugar Refining Corp., 495 F.2d 437, 443-44 (5th Cir.) (in Title VII class action litigation, district court should first consider whether employer's practices injured class as a whole and thereafter determine whether particular employees were actually members of the class who suffered injury), cert. denied, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974). The district court also could have ordered further proceedings to decide whether to divide the class into pre-default purchasers and post-default purchasers, if such a division eventually appeared necessary. By introducing the Blue Chip Stamps issue into the class certification decision, the district court erroneously considered the likelihood that unnamed plaintiffs would prevail on the merits. Cf. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78, 94 S.Ct. 2140, 2152-53, 40 L.Ed.2d 732 (1974).
 
 
 35
 Second, although numerosity of bondholders is not identical to numerosity of purchasers, the two issues are not completely unrelated. As bond trustee, Phenix National Bank had received a large number of coupons for the first three scheduled interest payments. Phenix National Bank made the first interest payment in May 1973, only six months after brokers began to sell the bonds. The market in which these bonds were traded was undeveloped, and nothing suggested that ownership of the bonds was drastically deconcentrated during the six months before the first interest payment became due. On the facts of this case, a demonstration that the class of bondholders as of the first interest payment was numerous probably sufficed to establish that the class of purchasers was numerous as well.
 
 
 36
 (3)
 
 
 37
 The district court erred in refusing to certify the class on the ground that Shores could not prove Bishop's allegations. As we noted in Kirkpatrick, 827 F.2d at 723, an assessment of a plaintiff's likelihood of success on the merits is an improper basis for deciding the propriety of class certification. Furthermore, Shores' inability to establish the circumstances surrounding Bishop's purchase of the bonds was immaterial in this case, for "[i]f plaintiffs employ a fraud on the market theory, individual issues of reliance virtually disappear." Ross, 837 F.2d at 994 (quoting Dekro v. Stern Bros. & Co., 540 F.Supp. 406, 417 (W.D.Mo.1982)). Shores does not need to show the detailed circumstances of Bishop's purchase to demonstrate Bishop's reliance; "a prima facie showing of reliance is established in a Shores type case upon proof of a scheme to bring securities onto the market which were not entitled to be marketed." Ross, 837 F.2d at 994. "Once the plaintiff proves that the deception was material (i.e., without it, the bonds would not have been marketed), reliance on the integrity of the market is presumed." Id. at 995.
 
 
 38
 Nor should the district court have refused certification because Shores could not demonstrate that Bishop was willing to accept "any marketable risk." One need not have been willing to accept any marketable risk to have a "typical" claim of fraud on the undeveloped market. In Ross, we rejected the view that Shores I limited recovery to plaintiffs who would accept "any marketable risk." Shores I "was intended to offer protection to the general investing public from frauds which cause otherwise unmarketable securities to be marketed. Whether or not the investor has relied on the offering circular she may assume that the bonds are at least entitled to be marketed." Ross, 837 F.2d at 997.[8]
 
 
 39
 (4)
 
 
 40
 Finally, the district court erred in refusing to certify the class because of what it perceived as potential for conflict between Shores' obligation to Bishop's estate and Shores' obligation to the class. We hesitate to upset the district court's determination on this issue, for questions concerning class certification are ordinarily left to the sound discretion of the district court, Griffin v. Carlin, 755 F.2d 1516, 1531 (11th Cir.1985), but we cannot accept the district court's conclusion that Shores was an inadequate class representative.
 
 
 41
 "The adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and of whether plaintiffs have interests antagonistic to the rest of the class." Griffin, 755 F.2d at 1533. As another circuit has stated, "[t]he representative must have common interests with unnamed members of the class, and ... it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." Senter v. General Motors Corp., 532 F.2d 511, 525 (6th Cir.), cert. denied, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976).
 
 
 42
 Under either formulation it is clear to us that Shores fulfills the adequacy requirement of Rule 23(a)(4). Certainly Shores has, in common with unnamed members of the class of purchasers, a financial interest in recovering against appellees under 10b-5. There is no doubt that Shores and his counsel have prosecuted this case vigorously and competently on behalf of both Bishop's claim and the class claim. Nothing on the record suggests that Shores' obligation to distribute Bishop's property within six months has interfered even remotely with the prosecution of this suit. Nor, in the nine years between Bishop's death and the district court's order, did Bishop's heirs ever move to abandon the claim.
 
 IV.
 
 43
 It is not without considerable hesitation that we reverse the district court's denial of class certification, for in doing so we resuscitate litigation that had shown promising signs of termination. We are compelled to do so, however, because the district court's order is essentially at odds with the current substantive law of the "fraud on the market" theory. Accordingly, the appeal of Norman Habshey is DISMISSED, the order of the district court denying class certification is REVERSED, the final judgment of the district court is VACATED, and the case is REMANDED with instructions to certify the class and for further proceedings consistent with this opinion.[9]
 
 
 44
 FAY, Circuit Judge, dissenting in part; concurring in part.
 
 
 45
 While agreeing that the appeal of Habshey (section IIB) must be dismissed, I respectfully dissent from the denial of the motion to dismiss the Shores appeal (section IIA). Love v. Turlington, 733 F.2d 1562 (11th Cir.1984), simply does not say or stand for the proposition set forth by the majority.
 
 
 46
 In the settlement of Love's individual claim, the parties discussed the fact that the ruling denying class certification would be appealed and the defendants agreed not to contest such. Id. at 1564. As the text of the opinion explains, Love had two claims: (1) one on behalf of herself individually and (2) one on behalf of an alleged class. She settled the first but not the second.
 
 
 47
 Dorse v. Armstrong World Industries, Inc. 798 F.2d 1372 (11th Cir.1986), likewise offers no guidance or controlling authority since our court specifically found that "[t]he stipulation for judgment ... expressly recognized Eagle-Picher's intent to appeal ... [as to] the government contract defense ..." 798 F.2d at 1376. Although the majority cites Roper, no mention is made of the fact that in that case the judgment appealed was entered over the objection of the plaintiff/appellant. As noted by the majority, Geraghty does not address the question.
 
 
 48
 In this matter the defendants made an offer of judgment to Shores. Shores accepted the offer and judgment was entered. There was no attempt made by Shores to reserve any rights whatsoever concerning the alleged class action. Unlike Roper, Shores voluntarily accepted the offer of judgment. The case was over and closed!
 
 As stated in Dorse, 798 F.2d at 1375:
 
 49
 Where the parties have agreed to entry of an order or judgment without any reservation relevant to the issue sought to be appealed, one party may not later seek to upset the judgment, unless lack of "actual consent" or a failure of subject matter jurisdiction is alleged. (citations omitted)
 
 
 50
 In my opinion the ruling by the majority is directly contrary to the language and spirit of Fed.R.Civ.P. 68 and renders it a nullity.
 
 
 51
 Although I would not reach the other issues presented, I continue to be concerned about the "fraud on the market" theory, see Ross v. Bank South, N.A., 837 F.2d 980, 1009 (11th Cir.1988) (Fay, J., concurring), and hope our court will consider it en banc.
 
 
 52
 I would dismiss both appeals.
 
 
 
 *
 Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 The Eleventh Circuit, in the en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981
 
 
 [2]
 See generally Ala.Code Secs. 11-54-80 to -123 (1975)
 
 
 [3]
 The classic version of the "fraud on the market" theory, known as "fraud on the open market," was first adopted by the Ninth Circuit in Blackie v. Barrack, 524 F.2d 891 (9th Cir.1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976), and was approved by this court in Lipton v. Documation, Inc., 734 F.2d 740 (11th Cir.1984), cert. denied, 469 U.S. 1132, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985). The Supreme Court expressly approved the "fraud on the open market" theory of recovery in Basic, Inc. v. Levinson, --- U.S. ----, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)
 
 
 [4]
 After the district judge to whom the case was originally assigned discovered that the brokerage firm handling his wife's investments had purchased shares for her in the holding company that owned Phenix National Bank, the judge recused himself, and the case was assigned to another district judge
 
 
 [5]
 Fed.R.Civ.P. 23(a) provides that one may sue as representative of a class only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Courts have recognized that these requirements often overlap. See, e.g., General Telephone Co. v. Falcon, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982) (typicality and commonality); Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir.) (typicality and adequacy), cert. denied, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); see also 3B Moore's Federal Practice p 23.06-2 (1987) (same)
 
 
 [6]
 Because we conclude that Habshey's appeal was untimely, we do not reach appellees' alternative argument that we lack jurisdiction over Habshey's appeal under this circuit's "anomalous rule," which precludes jurisdiction over an appeal from a district court's denial of a motion for permissive intervention unless the district court abused its discretion in denying that motion. See United States v. Jefferson County, 720 F.2d 1511, 1515 (11th Cir.1983)
 
 
 [7]
 "By definition, an essential prerequisite to a class action is the existence of a 'class.' " 3B Moore's Federal Practice p 23.04, at 23-98 (1987)
 
 
 [8]
 As we explained in Ross, although essentially any investor may rely on the fraud on the market theory, an investor who relies on that theory exclusively does so at considerable peril. In a fraud on the undeveloped market case, an investor must show that the securities would not have been marketed at all absent the fraud. See Ross, 837 F.2d at 997; Shores I, 647 F.2d at 470. "The investor who fails to read or otherwise rely on disclosure statements forfeits many otherwise available legal rights." Ross, 837 F.2d at 997. Nonetheless, "even the risk averse investor who fails to read disclosure statements to ensure that his purchases are safe is entitled to a bottom line reliance on the marketability of issued bonds." Id
 
 
 [9]
 We reject appellants' contention that we should remand with instructions to enter judgment for the class. We are aware of no authority holding that a defendant's offer of judgment to a named plaintiff made pursuant to Fed.R.Civ.P. 68 estops the defendant to deny liability to a putative class